May it please the Court, Dana Sullivan for Appellant Eric Oya, and I would like to reserve five minutes of my time, if I may, for rebuttal. In argument today, I would like to focus on three points. The first being that Oya had an enforceable employment contract with Blue Mountain Community College that created a reasonable expectation of continued employment. The second point would be that the college failed to provide Mr. Oya with a pre-termination hearing, contrary to its due process obligations. The third point is that there are material issues of fact as to whether Human Resources Manager Michael Shea failed to disclose the likely material contingency, that funding for the Physic Instructor position was uncertain, and accordingly, the District Court erred in granting summary judgment on Oya's statutory and common law claims for intentional misrepresentation. Let me ask a couple of questions about that. If I remember this right, which I may not, this deal with Shea, if it was a deal, was for a tenure-track faculty position, is that right? It was for a one-year probationary appointment. Would that be a tenure-track position? Do you understand? Let me make myself clear, because it looks like you don't understand what I mean. People get hired by colleges for tenure-track positions and non-tenure-track positions. Tenure-track, you may be an instructor until you get your PhD, then an assistant professor, and then if you get tenure, you're promoted to associate professor. Now, when you get hired as an instructor or assistant professor, it may be a one-year contract, it may be a probationary contract, but it's tenure-track, because if they like your performance and retain you, you will eventually get tenure. There are also non-tenure-track hires. For example, if a practicing lawyer teaches a constitutional law class at night at the state university, typically the lawyer is an adjunct professor. If you were to teach a course at your college, you'd probably be an adjunct, because you wouldn't want to lose your practice. That would be non-tenure-track. It really doesn't matter whether it's a one-year contract or a semester contract or what. You will never be an associate professor with tenure. Never? Well, unless you quit your law practice. Do you understand my question? I'm trying to find out not whether he's got a one-year probationary contract. I'm trying to find out whether the deal with Shane was for a tenure-track position. Well, I don't know that that terminology... I'm certainly familiar with that type of system for many private universities. I don't know that that was the system that was laid out by the collective bargaining agreement at the Blue Mountain Community College. What I do understand was that after a certain number of years of probationary employment, Mr. Oya would have been entitled to a faculty position with just-cause employment rights, as opposed to during the probationary periods where, although he would have just-cause dispensal rights during the period of the one-year contract, the contract could be non-renewed at the conclusion of the year for any reason deemed justified. Okay, so in this college, it's not like the usual private or state university with that tenure-track and adjunct positions. It's more like a union. It's a union deal. You get one-year employments, and then if you're there long enough, you can only be fired for cause? That's correct. Now, if he had gotten a one-year probationary contract and had performed satisfactorily and there had not been a budget problem, there would be a certain number of those, and then he could only be fired for cause? That's correct, and if I recall correctly, it's four years of probationary employment. I may be wrong on that. Four years of probationary, one-year contracts, and then he can only be fired for cause? That's my recollection, Your Honor. Now, as I understand it, he wound up getting some employment, but it's quarter-to-quarter. Well, when all was said and done, he was ultimately offered by the college president a quarter-by-quarter contract, but pursuant to the representations of the president, there was no just-cause dismissal rights applicable to that. In other words, at the conclusion of the quarter, he could easily have been... Let's say he had taken the quarter-to-quarter deal that the president offered him. If he had done that for four years, would he then only be subject to termination for cause? I don't know the answer to that, Your Honor, because I don't know that quarter-to-quarter contracts are expressly addressed in the collective bargaining agreement, nor do I believe that there's evidence in the record as to what the likely outcome would have been of a series of quarter-to-quarter contracts. The contracts had to be approved by the board, as I understand the record. Is that a correct recollection? Well, that's the central dispute in the case, actually, is whether, as a legal matter, the contract could be binding on the college absent approval of the board. What is the evidence to support your theory that it can be binding without the board's approval? Well, as a legal matter, if you look at board policy .18 and administrative procedure 23.33.1, which the district court failed to address, it's evident from those that the college board has delegated to the college president authority to hire professional faculty. Now, any individual reviewing the administrative procedure for hiring would infer, because that administrative procedure specifies that not only that the selection and employment of persons to fill authorized positions on the professional staff has been delegated to the president, but it says that the filling of positions which have been vacated in the first step of the hiring process shall be approved by the board. And then the procedure later says that... So you understand the shall be approved by the board to mean that any time something's put in front of them, they have to approve it. My point was that the way that the hiring procedure is laid out in the college's administrative procedures is that it's evident that at the initial stage of a hiring process, when there's a decision to be made as to whether a vacancy will be advertised, that the board has authority at that juncture to say, yes, it will be advertised, or no, it will not be advertised. But in this case, because the position was advertised, we can infer that the board had already exercised its authority in that regard and had authorized that the position be filled. The administrative procedure also provides that the department hiring committee makes a recommendation to the president, and after approval by the president and the board, the president in conjunction... That's correct. The president in conjunction with the human resources director then are authorized to convey an offer of employment to the prospective instructor. So in your description, the board has to approve it or it doesn't happen? Well, not exactly, Your Honor. The way that the delegation of authority is phrased in the board policy and the administrative procedure, we contend is an absolute delegation of authority for the hiring decision to the president. And although the administrative procedure provides that the board will have input at early stages in the hiring process, that an instructor who has received an offer of employment has a reasonable expectation that at that point, the board has signed off on the hire. Well, I don't understand what a reasonable expectation is in this context. Somebody has authority to make a contract on behalf of the college, and that isn't a matter of reasonable expectation. It's a matter of who has authority and who doesn't. Who has to sign off on it before a paycheck will be cut? Who has to sign off on it before someone actually becomes a faculty member? And I still don't understand anything you've said to mean that the board, someone from the board doesn't sign off on the contract. Well, to the extent that board authorization is required, the administrative procedures dictate that that authorization be obtained prior to the conveyance of an offer of employment. In this case, an offer of employment had already been conveyed. And so, one can infer that the the, as I stated previously, it's our position that the board policy and the administrative procedure read together provide for the delegation of hiring authority to the president. So, at the time that the president conveyed to Mr. Oya the employment contract, that at that time, when he said, when the president said, you know, to accept this offer, you need to sign this contract and return it to the college, it's the appellant's position that it was at that time that his contract became enforceable. Because the president had the hiring authority, either actually as a matter of state law, or as a matter of apparent authority. And with, I'm sorry, did you have a question? I'll go on to my apparent authority argument, which rests on the case of Wiggins versus Barrett & Associates. And that case makes clear that under Oregon law, the doctrine of apparent authority can serve as the basis for a contract with a municipality. And the elements necessary to bind the municipality under Wiggins are, one, that the municipality close the agent with apparent authority. Two, the promise is, one, that the municipality could lawfully make and perform. Three, that there's no statute or administrative rule that would place the act beyond the agent's authority. Four, that the authority has no reason to know the want of actual authority. And five, that the municipality has accepted and retained the benefit received in return for the promise. Let me back up to what I was thinking about a moment ago. The Blue Mountain Community College administrative procedures in the excerpt of record at page 78 say, following approval by the president and the board of education, an offer of employment shall be made to the most desired candidate. Now, papers were sent to this man and a telephone conversation was had with this man that looked a lot like an offer of employment. But you're not claiming that the board of education had approved it. No. No. In fact, the evidence in the record was to the contrary, that it had not been submitted to the board. Contrary to the administrative procedure. The evidence is not contradicted. The board had never approved it. That's correct. So that would make it an unauthorized offer if it was an offer. Well, pursuant to the administrative procedures, that's correct. However, then you move into our estoppel arguments as to why. I don't really understand the estoppel. The point of Restatement 90 is to substitute estoppel for consideration, not for offer and acceptance. Well, in this case, if you read the Wiggins case, the Oregon case that discusses apparent authority, it talks about how apparent authority in terms of binding a municipality and estoppel are very similar. How do you get apparent authority when you've got an administrative procedure that I suppose is public, right? Is the administrative procedure public? Yes. When you've got a public administrative procedure that says there isn't any authority, so the board of education approves. Well, in this case, we have the statements in the conversation that the human resources director had with Mr. Oya, in which he represented that the offer was as official as it gets. Let me ask you something about Shea. It looks to me as though Shea is responsible for a great deal of harm to Oya. You told him that it's a fully budgeted tenure track position, though you say you don't understand what he's talking about, tenure track, because it's not their scheme. When Oya asked him, is this a real official offer? Can I sell my house? He said, sell your house, move to Pendleton. This is as official as it gets. That was a false statement. That's correct. Are you suing Shea personally for damages, or are you just suing Shea in his capacity as human relations vice president or something like that, so that the college will be vicariously liable for the damages caused by Shea's misstatements? Shea was initially named as a defendant in his individual capacity, and those claims were not pursued after summary judgment. So we don't have to consider whether Shea would be liable in his individual capacity? That's correct. In the real world, the world of private economics, you have boards which set policy, and they delegate the position making and the hiring and the firing to a president or a chief executive officer. Now, why wasn't that rule the rule in this case? Well, it's our position that that's what did occur in this case, that as a legal matter, the board did delegate to the president the hiring authority. Anybody faced with that factual situation would think that it was perfectly legal for the president to hire me or fire me. Well, and in fact, that was Mr. Oya's testimony, because he had left a tenure track teaching position in the public school system. He had had ongoing annual employment contracts and said that any board approval that was required was simply pro forma, and that it was actually the president, in his mind, who had the authority to make that hiring decision. I'd like to reserve my remaining time. There was a board resolution that granted the president the authority to hire and fire? That's correct. No questions about that? Correct. Well, why did the district judge then grant summary judgment in light of all these facts? Well, he didn't look beyond the state statute, which vests the board of education with the authority to carry out personnel matters. And when you look beyond that state statute, that's when you see that the board policy and the administrative procedure provide for delegation of the authority to the president. Now, if I may, I'd like to reserve the remaining time. May it please the court, Lisa Lear, appearing on behalf of defendants. I'd like to begin with talking about the status of the question of delegation of authority from the board to the president for purposes of a binding employment decision. Is there a law that says they can't? There is a statute that grants to the board the authority to perform all the acts on behalf of the Blue Mountain Community College. They said all policies? Well, it includes the authority to hire and establish policies and procedures for the college. Correct. The boards in the real world and in the educational world are existent? Correct. Sub-policy? Correct. They delegate the activities and the workings of the policy to somebody else? They can, yes. The finance officer, the president, the janitor, the security, and everything else to somebody else. They certainly can't. That would never happen in this case. They delegated some authority, but not the authority to make final hiring decisions with respect to professional personnel. Let's say you're right on that. Frankly, I think your breach of contract defense is strong, but it's not the whole case. Correct. My problem with your case is I'm having trouble distinguishing Arboiro versus Adidas Salomon. It seems really similar. It looks like in that case, in similar facts, we reversed the summary judgment on the misrepresentation claim. Correct. Here, there just isn't any doubt that Michael Shea made misrepresentations on behalf of the college to induce Oya to quit his job and move to Pendleton. It's hard for me to say that there wasn't justifiable reliance when he specifically asked Michael Shea, who is the vice president in charge of this sort of thing, can I count on this? Is this really a final deal? Shea says it's as official as it gets. It's fully budgeted tenure track position. You can sell your house and move to Pendleton. You should sell your house and move to Pendleton. Then he even tells the bank, yeah, loan the guy the money because we're hiring him. It seems just like this Adidas Salomon case. Why isn't it? I think it's important to recognize that we're talking again about breach of contract claims and an intentional misrepresentation of fraud. We're not talking about contract claims. That's what was involved in both cases. The court in the Arborio case said you don't have a contract here, but you do have the fraud claim. The difference between the two cases, there's two important differences. One is there was no allegation or no challenge in an Arborio case about the authority of the person making the representations. But it wouldn't matter to a misrepresentation claim. The authority would just matter to the contract claim. No, it matters to the misrepresentation claim because of justifiable reliance. And in this situation, and it's our position, we disagree strongly with the plaintiff. Did anyone ever send Oya a copy of those regulations or anything? I have no idea whether he had copies of them at the time that he made the decision. It isn't justifiable reliance to rely on what the vice president in charge of, I can't remember what they call it, but it basically means hiring. He's the human resource. Human resources. Vice president in charge of hiring people. Under established Oregon law. Why can't you justifiably rely on his, when you ask him, is this official? And he says, yes, it's as official as it gets. Why can't you rely on him justifiably? Under established Oregon law, a person dealing with a public body, an agent of a public body, has their own obligation to determine the scope of the authority of that person. And if they take, if they rely on a representation by a person without authority, they take that risk on themselves. Which Oregon authority? If you look at the Holdner case, Holdner v. Columbia County, and if you look at the city of Millau v. Coober, they both talk about the obligation to determine the scope of the agent's authority. The Wiggins case talks about it as well. And of course, Wiggins is a little bit different because we've got a somewhat different situation there. But what we're dealing with here that distinguishes- I can't remember, are those cases about misrepresentation or are they about contract? They're contract claims. Yes, that's a different thing. But again, you still have the justifiable reliance issue. Holding a government to a contract is different from suing a government for a tort of misrepresentation based on the act of its agent. But you're accomplishing the same result by saying that we can't enforce the contract, but we can hold you to the representation made by the person who didn't have authority to enter the contract in the first place. Part of the reason that becomes important is that you- he had authority to make the statements he did. Everybody thought that he had the right to go ahead and make the contract. No one ever suggested that Shea had authority to bind the college. The question was whether the president had authority to bind the college. Shea never was- no one has ever asserted that Shea had the authority to bind the college. Shea conveyed the offer that was to come from the board and the president after appropriate approval of an offer. But no one ever claimed that Shea himself had authority to bind the college. Shea made representations about whether the offer that was coming was, in fact, secure and all that. But no one ever claimed that he himself had authority to bind the college. The question was whether the offer that came in the letter from the president, which said, my plan is to submit this to the board for approval, and came with a contract that included a line for board approval, board signature, which was blank. But you also have the standard in Oregon that you have the obligation to determine the authority of the agent. You have- Counsel, those cases all seem to arise, though, at least if I remember them correctly, in the context of a claim of a contract or promissory estoppel. And I think Holden also dealt with inverse condemnation. I can't think of a single one that dealt with a fraud or misrepresentation claim and held that same thing to be true. I mean, I understand the point of it is to protect the public fisc and also to say a statute is a statute and everybody is deemed to know what it says. My difficulty, though, is that I don't read the statute here as forbidding delegation. And we're not saying that it does. We're saying that it's an act that wouldn't be a delegation. Well, but he could read the statutes and have memorized them and not know that this was an unauthorized representation. The statute- No, I disagree. The statute grants the authority to the board to perform these acts. The board does have authority to delegate. What the board delegated was very clear that we're delegating the authority to do certain types of hiring. But when it comes to professional personnel, the board has final approval. That appears in the administrative procedure. It appears in the board policy 018 and the board policy 3.33. All of them make clear that the board retains the authority for final approval of instructor or professional staff. We're not talking about a situation here where they're hiring the janitorial staff or those day-to-day operations. Much of that has been delegated. In fact, the testimony was many, many things- It's already judgment. There was no testimony. Affidavits and deposition testimony. There was no testimony. Affidavits and deposition evidence. That's all disputed. Nobody knows what happened in this case. So why shouldn't it go back to a trial? Because you still have the problem with respect to the obligation to determine the authority of someone who is acting as an agent of a public body and whether you can justifiably rely on somebody who, if you make that determination, does not have the authority to bind. Clearly, Shea does not have that authority. Your answer to Judge Ferguson would be, it really doesn't matter if Shea just out and out flat lied to Oya and told him knowingly and falsely that he had the job. It was official. He should sell his house and move to Pendleton. It was guaranteed. As official as it gets, knowing that he was lying, knowing that Oya would rely because Oya couldn't justifiably rely because Oya should have known that until the board approves, it's not a deal. And this is where I'm having trouble because of what Judge Bravery listed from you. Somehow, we've got a plug in there and he should have known the board hadn't approved. Because, well, you've got- Well, there's several things. First of all, all board activity has to be done by a vote of the majority of the board on public record. Well, you can certainly check the public records and determine that it hasn't. But you've also got a blank contract in front of you. The line for board approval is blank. If the vice president in charge of human resources tells him it's a done deal, why should he check the records to see if the vice president is lying to him? The vice president doesn't have the authority to make that representation. When you deal under Oregon law, when you deal with a public, let's say hypothetically, I don't think you're understanding my question. No, I do. I'm going to give you a hypothetical to make my question clear. Let's say the vice president had said, this was submitted to the board and the board approved it. And that was a lie. Would Oya still be obligated to get his own copy of the board minutes and see if it was true? I think upon established case law, it says yes. But that's not sufficient. Tell me the case. I'd have to go back and look for additional cases. I realize that. But I still think if you go to Holdner and you go to the city of Malala, you'll see that... There are contract cases. They're no use to you. But you had people making representations that, I'm going to agree to give you this flow valve. I'm going to agree to enter into this contract with you. I'm going to agree to do all these things. And people were harmed by the same way. The result is the same. You don't try to respond to my question. And you may win or lose depending on whether there's a case. And what I'm looking for is not a contract case. I'm looking for a tort case. What I am interested in is, suppose the vice president said the board had approved. This is a variant of Judge Graber's question. How is he supposed to know that the board didn't already delegate authority? Suppose the vice president said the board has approved. You're saying there can be no justifiable reliance. And I'll find Oregon case law to that effect. And I want to know what case. And I can't right now cite you a case, a tort case that does that. I do believe that there is Oregon law that deals with both tort and contract cases that say that you have the obligation to determine the authority of an agent of a public body. And that you're still back to the question here of justifiable reliance. If there are public records that establish what the board has done. And if you have an obligation to determine the authority of an agent of a public body and can do that. And there is administrative procedures and rules that say it is the board that has to do this. The fact that somebody told you otherwise. Okay, but you can't give me a specific case that I can read and say she's right. Ordinarily, when a public body commits a tort, it does so in what could loosely be termed an unauthorized way. Because presumably no public body says we hereby authorize all of our employees to go out and commit torts. So ordinarily in the tort context, one isn't asking about authority. One is asking about things like did the person act in the scope of their employment and that sort of thing. If we apply those general principles, then certainly Shea was acting within the scope of his job description in dealing with this person. So are you left only with the argument that even in the tort context, the person is deemed to know the limits of his authority? Is that true? Well, I think so for the purpose of a claim for intentional misrepresentation, the requirement that the person established justifiable reliance on the representation that he says gave him the situation to where he's at. And I'd be happy to provide the court with additional authorities focusing on the tort issue. But I do believe there is Oregon case law that deals with tort and contract with respect to the duty to determine the authority of a public body. We've asked and you've just said it's there, but you don't know what it is. Let me ask you something else. There's a statute. It sounded from the briefs as though it's considered obscure in Oregon, but it comes up all the time in Alaska. That's the 659.815. We have a similar statute. I think it may have been copied from Oregon, actually, because people bring people up to remote sites for mining and fishing, and then they tell them after they're there without the fair back, oh, by the way, the deal's not what we told you on the phone. It's actually not nearly as good a deal. And this statute says that a person is entitled to damages, minimum statutory damages and any person, firm, company, corporation or association of any kind persuades a worker to change from one place to another or brings a person into the state to work by any false or deceptive representation. Now, I don't actually understand why that wouldn't apply here. To me, the false representation doesn't just have to be the amount of compensation. It can be the character of compensation. And a quarter-to-quarter deal is different from a one-year probationary deal. Well, but the representation here concerns the security of the position. This isn't about the change that occurred after. It's not just the security of the position. Whether it's a one-year probationary contract or a quarter-to-quarter contract, terminable at will. And in one case, you're entitled to your deal for a whole year. In the other one, you're not. In addition, in the one case, you're clearly entitled to firing only for cause if it's renewed for four years. In the other, it's not clear. So it seems like a difference in character. But I think you're talking about something different than what the allegations are in this case. The claim under this portion of the complaint has to do with the question whether the failure to notify OHA about the fact that there might be these financial considerations that would The issue about the quarter-to-quarter versus one-year contract was not what this was about. That came up after the board learned that the governor might veto the current budget proposal and the board had to scramble and the president had to determine, what are we going to do now that we aren't going to have the funding we anticipated? They looked for options. The first thing they did is pull the 11 positions off the consent agenda to hold that back while they tried to determine what would happen. And in an effort to try to deal with these people, they then said... I don't even see why that matters. If somebody lies to you and tells you you've got a job and then when you sell your house, move, buy a new house and show up for the job, they tell you you don't, but it's not our fault because we didn't make as much money as we hoped to in the market or we didn't get the budget from the legislature or whatever. That's their problem, not your problem. But the issue here is whether or not the character of the compensation was misrepresented. Nobody told him, come here, you're going to have a year and then when you got here, they say we're going to give you a quarter to quarter. That was an effort to resolve a problem that developed after he had already come and the budget crisis developed. It wasn't that they knew all along that they were going to offer a quarter to quarter contract and they made the one year offer and then it changed because that was the plan all along. This was an effort to try to provide some relief while there was an effort to work out the situation with the budget crisis, but it wasn't that somebody brought them there with the intent to say we're going to give you a year contract when they knew that they were only going to offer quarter to quarter. The purpose of their claim was to say you should have told us that there was a budget risk at all and that's where they say the character of the compensation is at issue. It was never about the difference between the one year and the quarter to quarter. So you would say I should read the statute to mean if a person is induced to sell his house in Oregon and move to Igigic, Alaska, by the employer saying you've got a job, don't worry about it, it's official, it's solid, sell your house, move to Igigic, that would not be a cause of action? Not under this provision, no. It would only be if he said you're going to get $40 an hour and then when he gets to Igigic he tells him $30 an hour, then it would be a cause of action? That's what this statute is about, yes. That's what this provision is about. It addresses the character of the compensation itself. Unless the court has other questions, we believe the summary judgment should be affirmed. Thank you, Kamal. Thank you. I just wanted to start by correcting a statement that I had made earlier in response to your question about the tenure track. It's an ER 94, it's five years, after five years of probationary employment pursuant to the collective bargaining agreement, an instructor shall attain status as a regular employee. And a regular employee I think is what Mr. Shea was referring to as a tenure track position. Moving on to the intentional misrepresentation issues, this case is not distinguishable from Arboro. In that case, the only distinction that opposing counsel really has tried to draw is that this is a public entity and in that case there was a private entity. And I think her argument is basically what's reasonable to assume about a private employer is not reasonable to assume about a public employer. And I guess I'd like to ask you the same question that Judge Kleinfeld was asking Ms. Lear and that is, are there any tort cases involving fraud or intentional misrepresentation that deal with the question of justifiable reliance on the statements of an employee or agent of a public body that you're aware of? I'm not aware of any, Your Honor. But it seems to me, and that was the distinction, in fact that was really the only analysis that the district judge gave it all to this issue was that Arboro is distinguishable because it involved a public body. I just, I don't see the basis for that distinction where you meet all the other elements of the tort why a public body would be held to a lesser standard than a private entity in terms of these hiring issues. Well, it certainly is in the realm, for example, of promissory estoppel, which is what Holdner is about. So it's clear that in many kinds of cases, people who think they're contracting with public bodies do have the burden to find out if there's really authority. But I guess what I'm wondering is whether any of those cases deal with the fraud area and you're saying you don't think so. Well, an analogy that comes to mind is that those estoppel cases that we do cite, for example, the Arboro case, that case talked about how the exception of estoppel was applicable in that case because of intentional malfeasance on the part of the employer in terms of leading, knowing that the employee was moving and winding down a law practice to accept the offer of the employer, the contingent nature of the offer. And it seems to me that logically where you have similar facts of intentional malfeasance misrepresentation, that for the same reason that estoppel would apply in the contract context, it makes sense to hold the public entity liable in the tort context. And my time is up. Thank you. Thank you. Oya versus Blue Mountain is submitted.
judges: Ferguson, Kleinfeld, Graber